# United States Court of Appeals for the Federal Circuit

---

**ALLEN R. BRAUN,**
*Petitioner*

**v.**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES,**
*Respondent*

---

2019-1949

---

Petition for review of the Merit Systems Protection Board in No. DC-0752-16-0743-I-2.

---

## ON PETITION FOR REHEARING EN BANC

---

GEORGE CHUZI, Kalijarvi, Chuzi, Newman & Fitch, PC, Washington, DC, filed a petition for rehearing en banc for petitioner.

TANYA KOENIG, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, filed a response to the petition for respondent. Also represented by BRIAN M. BOYNTON, MARTIN F. HOCKEY, JR., TARA K. HOGAN.

NED MILTENBERG, National Legal Scholars Law Firm,

P.C., Bethesda, MD, for amici curiae Peter A. Bandettini, Peter J. Basser, Jack R. Bennink, Karen Berman, Bibiana Bielekova, Carson C. Chow, G. Marius Clore, Leonardo Cohen, Cynthia E. Dunbar, Charles E. Egwuagu, R. Douglas Fields, Joseph Frank, Charles Gerfen, Mark Hallett, Kenneth A. Jacobson, Elaine S. Jaffe, Stephanie J. London, Alex Martin, Elisabeth A. Murray, David Lee Robinson, Eric M. Wassermann, Howard Young, Joshua J. Zimmerberg.

―――――――――――

Before MOORE, *Chief Judge*, NEWMAN, LOURIE, DYK, PROST, O'MALLEY, REYNA, WALLACH*, TARANTO, CHEN, HUGHES, and STOLL, *Circuit Judges*.

Opinion dissenting from the denial of the petition for rehearing en banc filed by *Circuit Judge* NEWMAN.

Opinion dissenting from the denial of the petition for rehearing en banc filed by *Circuit Judge* O'MALLEY.

PER CURIAM.

# O R D E R

Allen R. Braun filed a petition for rehearing en banc. A response to the petition was invited by the court and filed by the United States Department of Health and Human Services. A committee of scientists concerned about tenure requested leave to file a brief as amici curiae, which the court granted. The petition was first referred as a petition for rehearing to the panel that heard the appeal, and thereafter the petition for rehearing en banc was referred to the circuit judges who are in regular active service. The court conducted a poll on request, and the poll failed.

―――――――――――

\*   Circuit Judge Wallach assumed senior status on May 31, 2021.

BRAUN v. HHS                                                                 3

Upon consideration thereof,

IT IS ORDERED THAT:

The petition for panel rehearing is denied.

The petition for rehearing en banc is denied.

The mandate of the court will issue on June 11, 2021.


FOR THE COURT

June 4, 2021                    /s/ Peter R. Marksteiner
     Date                       Peter R. Marksteiner
                                Clerk of Court

# United States Court of Appeals for the Federal Circuit

ALLEN R. BRAUN,
*Petitioner*

**v.**

DEPARTMENT OF HEALTH AND HUMAN SERVICES,
*Respondent*

2019-1949

Petition for review of the Merit Systems Protection Board in No. DC-0752-16-0743-I-2.

NEWMAN, *Circuit Judge*, dissenting from denial of the petition for rehearing *en banc*.

The full court today denies the petition of Dr. Allen Braun for *en banc* review of the panel's holding that the National Institutes of Health ("NIH") need not comply with its own special procedures for tenured employees, and that these procedures will not be enforced by the court. I write to point out the concerns raised by this flawed holding, and to dissent from the court's inaction.

"[T]he primary purpose of tenure [is] serving and providing a benefit to society by the unimpeded search for truth and its exposition." Mark L. Adams, *The Quest for Tenure: Job Security and Academic Freedom*, 56 Cath. U. L. Rev. 67, 81 (2006) (citing Am. Ass'n of Univ. Professors,

Statement of Principles on Academic Freedom and Tenure (1940), *reprinted in* AAUP Policy Documents and Reports 3 (9th ed. 2001)).  The NIH adopted a tenure structure for its scientists, tracking the tenure principles of academia: "Rather than viewing tenure as a luxury or bonus provided to faculty without a benefit to the employer, it is more correctly described as the foundational, legitimating cornerstone of a university." *Id.* at 80.

The NIH describes its system of tenure as designed to attract the brightest and most gifted scientists to its employ:

> to ensure the highest attainable quality in the scientific staff engaged in intramural research and related medical care.

Nat. Insts. of Health, *Tenure in the NIH Intramural Research Program*, https://oir.nih.gov/sourcebook/tenure-nih-intramural-research-program (March 17, 2015).  The NIH system of tenure, and its contribution to stability and security in employment, serve to encourage investigation into complex and difficult problems; to support exploration of contentious scientific issues; and to facilitate independence of thought and action without fear of political or other repercussions.

Dr. Braun was a tenured scientist at NIH.[1]  As relevant to this appeal, NIH has designated procedures for review

---

[1]    Dr. Braun was employed by NIH in 1984 and received tenure in 2003.  The record describes him as a world-recognized expert in the neural bases of language, sleep, and motor functions, and states that his research at NIH is reported in over 125 publications and has been cited about 14,000 times.  At the time of the removal action here on appeal, his position was Chief of the Voice, Speech, and Language Branch; and Senior Investigator, Division of

of performance concerns of tenured scientists, including participation of the Central Tenure Committee, as set forth in the NIH Policy on Performance Management, Disciplinary Actions and Administrative Removals for Title 42 Employees ("NIH Policy"):

> Tenured scientists must undergo the de-tenuring process before a performance-based action may be taken against them  See section K-3 [The Tenure Process].

NIH Policy § H.1 (Termination for Unacceptable Performance); J.A. 67.  The NIH refused to implement its designated procedures in terminating Dr. Braun, despite his requests.  After his termination he appealed to the Merit Systems Protection Board, and the Board held that it would not consider NIH's non-compliance with the tenure-required procedures.  This court affirmed, holding that only the procedures set forth in Title 5 for all federal employees are considered by the MSPB and the court.

I previously explained that the NIH action is contrary to law and precedent, for "[a]n agency is required to act in accordance with the procedures it adopts for itself, and the Board will enforce employee rights derived from such rules." *Campbell v. U.S. Postal Serv.*, 75 M.S.P.R. 273, 279 (1997); *Stone v. FDIC*, 179 F.3d 1368, 1378 (Fed. Cir. 1999) ("Public employees are, of course, entitled to whatever other procedural protections are afforded them by statute, regulation, or agency procedure which is in addition to the protections afforded by the Constitution."). *See Braun v. Dep't of Health & Hum. Servs.*, 983 F.3d 1295, 1306 (Fed. Cir. 2020) (Newman, J., dissenting).

This judicial refusal to require compliance with tenure-mandated protections has implications for the public

---

Intramural Research, National Institute of Deafness and Other Communication Disorders.

4                                                    BRAUN v. HHS

interest in preserving NIH as a premier research institution.  As summarized by the *amici curiae,* "undermining the tenure system will have three noxious side-effects" likely to manifest themselves immediately and in the long run:

> First, undercutting NIH's tenure system will dissuade senior NIH scientists from remaining there;

> Second, undermining NIH's tenure system will impede NIH's ability to recruit qualified scientists to replace ones who leave;

> Finally[,] NIH's impeded ability to retain and recruit top-notch scientists will render NIH less able to protect the Nation's safety and health.

*Amici curiae* Committee of Scientists Concerned About Tenure, Br. 8.

As federal judges we understand the power of our constitutional tenure to protect independence of thought and action, free of bias, pressure, and political influence.  Justice Harlan in 1891 wrote:

> Whoever is here clothed with a judicial office, which empowers him to judge in any case affecting **t**he life, liberty, or property of the citizen, cannot be restrained from the fearless exercise of its duties by any apprehension of removal or suspension, in case he should come athwart the will or pleasure of the appointing power.

*McAllister v. United States*, 141 U.S. 174, 195 (1891).  The *amici curiae* summarize the corresponding purposes of tenure at NIH:

> [J]ust as judicial tenure (1) boosts intellectual "individualism" amongst judges, (2) inspires "public confidence" in them, and (3) fosters the attraction and retention of "well-qualified persons" to the bench, academic tenure does exactly the same

three things for scholars and for institutions like
NIH.

*Amici curiae* Br. 14. The goal is to employ the highest lev-
els of talent, quality, and experience, to achieve at the NIH
the benefits of academic tenure, in ultimate service to the
nation:

> [Without the] job security tenure pro-
> vides . . . much experiment, scholarship and intel-
> lectual risk would not be undertaken. Job security
> not only allows the faculty member to pursue the
> controversial, but also to investigate matters that
> present a high probability of failure, including
> those particular to the sciences, where failure can
> occur after years and even decades of research.

James. J. Fishman, *Tenure and its Discontents: The Worst
Form of Relationship Save All of the Others,* 21 Pace L. Rev.
159, 182–83 (2000).

Today, as the nation increasingly relies on the NIH for
study of the most complex problems of humanity, our rul-
ing that NIH's tenure protections will not be enforced by
the courts, warrants review *en banc*. From the court's de-
nial of review, I respectfully dissent.

# United States Court of Appeals for the Federal Circuit

---

**ALLEN R. BRAUN,**
*Petitioner*

**v.**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES,**
*Respondent*

---

2019-1949

---

Petition for review of the Merit Systems Protection Board in No. DC-0752-16-0743-I-2.

---

O'MALLEY, *Circuit Judge*, dissenting from the denial of petition for rehearing en banc.

Because the Department of Health and Human Services ("HHS") is bound by its own clear policy, I respectfully dissent from the denial of rehearing en banc. The panel majority in this case misinterpreted the HHS policy and spilled substantial ink contemplating whether Dr. Braun deserved termination. We need not have waded into those murky waters. HHS granted Dr. Braun tenure and drafted detailed procedures for the removal of tenure. It then chose not to follow those procedures. We should rehear this case en banc and require HHS to adhere to its own procedures.

BACKGROUND

In 2003, Dr. Allen Braun received tenure at the National Institutes of Health ("NIH"), an agency within HHS, pursuant to 42 U.S.C. § 209(f).  Tenure at NIH grants certain benefits and job protections, including a detailed de-tenuring procedure which applies in the "rare event" of removal of tenure.  NIH Policy on Performance Management, Disciplinary Actions and Administrative Removals for Title 42 Employees (NIH Policy), § K(3) (2007).  Yet, when NIH removed Dr. Braun from his position in 2016, it did not follow that procedure.

THE NIH POLICY

An agency must follow its own procedures.  *See Fort Stewart Schs. v. Fed. Lab. Rels. Auth.*, 495 U.S. 641, 654 (1990).  Even where its procedures are more generous to beneficiaries or more onerous on the agency than required by statute, the agency is bound to follow them.  *See Vitarelli v. Seaton*, 359 U.S. 535, 539 (1959); *Voge v. United States*, 844 F.2d 776, 779 (Fed. Cir. 1988) ("It has long been established that government officials must follow their own regulations, even if they were not compelled to have them at all . . . .").

NIH adopted a policy which applies to the removal of NIH employees, tenured and non-tenured: the NIH Policy on Performance Management, Disciplinary Actions and Administrative Removals for Title 42 Employees. (the "NIH Policy").  Four provisions of the NIH Policy are relevant to this case: § B, § K, § H(1), and § L(1).  Section B makes clear that, while the NIH Policy covers all Title 42 employees, it provides additional benefits and protections to tenured employees.  NIH Policy § B.  Section K(3) makes clear that "[r]emoval of tenure . . . *only* occurs" through the de-tenuring procedure established in that section.  NIH Policy § K(3) (emphasis added).  Sections H(1) and L(1) explicitly state that the de-tenuring procedure must be followed when a tenured employee is removed for

unacceptable performance or administrative reasons.  NIH
Policy §§ H(1), K(1).  I provide the relevant text of these
provisions below.

First, section B of the NIH Policy states that it applies
to all Title 42 employees, irrespective of tenure status.  Cer-
tain provisions of the NIH Policy are applicable only to ten-
ured employees and provide additional benefits and job
protections beyond those provided for non-tenured employ-
ees.  Section B states, in relevant part:

> This policy applies to all Title 42 employees includ-
> ing . . . [a]ll employees appointed under 42 U.S.C.
> 209(f) and 209(g) (tenured and tenure-track scien-
> tists in the intramural program appointed under
> Title 42 are also covered by these policies and pro-
> cedures, but additional rules may apply to them as
> noted) . . . .

NIH Policy § B.

Second, section K provides for benefits and job protec-
tions associated with tenure at NIH.  It also states NIH's
policies regarding tenure.  For example, § K(1) states, *inter
alia*, that "it is the policy of the NIH that long, stable, pro-
ductive careers will continue to be the rule."  NIH Policy,
§ K(1).  Section K(3) provides a detailed de-tenuring proce-
dure.  It is not necessary to delve into the specifics of that
process here, as there is no dispute that the NIH did not
follow that procedure when it removed Dr. Braun's tenure.
It suffices to note that § K(3) states that:

> Removal of tenure is a rare event and *only* occurs
> after thorough review by the IC and the Central
> Tenure Committee (CTC), with final decision by
> the Deputy Director for Intramural Research.

NIH Policy § K(3) (emphasis added).

Third, section H(1) of the NIH Policy provides for ter-
mination of employees for unacceptable performance.  It

applies to all Title 42 employees but expressly provides tenured employees with additional protections before they may be removed for unacceptable performance. Section H(1) states, in relevant part:

> When an employee has demonstrated Unacceptable performance, based on the results of the opportunity given to improve performance and other relevant information, the employee's supervisor or other designated official will prepare a recommendation for termination and a justification in support of that recommendation. Employees will be notified in writing of the recommendation and the reasons for it or thereof. Employees will have the right to respond orally, in writing, or both, to the IC Director or an individual designated by the IC Director to receive the response. The employee may be represented in this process. Normally a period of not less than seven days and not more than 14 days will be given to the employee to provide the response, with extensions granted, if warranted. *When the employee is a tenured or tenure-track scientist, those specific policies and procedures also apply. Tenured scientists must undergo the de-tenuring process before a performance-based action may be taken against them. See section K.3. . . .*

NIH Policy § H(1) (emphasis added). It is undisputed that the conduct with which Dr. Braun was charged falls within the scope of this provision.

Finally, section L(1) of the NIH Policy provides for terminations "for cause" or for administrative reasons. This provision applies to all Title 42 employees, as provided in § B. It explicitly references the de-tenuring process in reference to terminations for administrative reasons but is silent as to the interplay between tenure and terminations "for cause." Section L(1) provides, in relevant part, that:

>    Appointments may be terminated before the expiration date for cause, e.g., personal or scientific misconduct.  Under certain rare and extraordinary circumstances appointments may be terminated [] for administrative reasons.  Terminations for administrative reasons may be made only for programmatic reasons, e.g., lack of funds, re-direction of program resources.  However, a tenured scientist may not be terminated for administrative reasons without going through the de-tenuring process.  Title 42 employees recommended for termination will be notified in writing of the IC's recommendation and the reasons thereof.  IC Directors may delegate the authority to issue such recommendations.  Employees will have the right to respond orally, in writing, or both, to the IC Director, and to be represented in this process.  Normally, a period of not less than seven days and not more than 14 days will be provided for response, with extensions granted, if warranted.  The employee will receive a written decision from the IC Director.

NIH Policy § L(1).  As discussed below, the silence regarding tenure in the context of "for cause" proceedings is understandable and does not carry the implications the majority believes.  "As one court has aptly put it, '[n]ot every silence is pregnant.'"  *Burns v. United States*, 501 U.S. 129, 136 (1991) (quoting *Ill. Dep't of Pub. Aid v. Schweiker*, 707 F.2d 273, 277 (7th Cir.1983)), *abrogated on other grounds by United States v. Booker*, 543 U.S. 220 (2005).

## THE PANEL MAJORITY'S OPINION

The panel majority found that, "[a]s a matter of unambiguous meaning, de-tenuring is not required under the NIH Policy for a termination that comes within § L(1)," the section that provides for "for cause" removal.  *Braun v. Dep't of HHS* (Maj. Op.), 983 F.3d 1295, 1301 (Fed. Cir.

2020). It found that the section's silence as to de-tenuring meant that removals "for cause"—even where the only "cause" relied upon is performance related—do not require de-tenuring. *Id.* The majority found that its interpretation was "reinforced by the NIH Policy's express inclusion of de-tenuring requirements for two other bases of removal," removal for unacceptable performance in § H(1) and removal for administrative reasons in § L(1). *Id.* It found further confirmation of its interpretation in "the statutory scheme that the NIH Policy's own structure clearly echoes," chapters 43 and 75 of title 5 of the United States Code. *Id.* at 1302. I disagree.

DISCUSSION

The normal rules of statutory interpretation apply to interpretation of agency procedures. *See Roberto v. Dep't of Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006). Applying those rules of construction here reveals that the NIH Policy unambiguously requires § K(3)'s de-tenuring procedure before removing an employee's tenure in all cases, and particularly those where, as here, the grounds for the removal are performance based.

The panel majority reads § L(1)'s silence as to the role of the de-tenuring process in a "for cause" termination to mean that the de-tenuring process does not need to be followed in any circumstances that NIH classifies as based on "cause." The panel majority then goes further and concludes that, where conduct falls within both the "unacceptable performance" contemplated in § H(1) and the concept of "for cause" in § L(1), NIH may *choose* to proceed under § L(1) and ignore the requirements of § H(1) and § K(3). But that interpretation ignores the explicit statement in § K(3) that "[r]emoval of tenure . . . *only* occurs" through the de-tenuring process and it ignores the specific provisions for tenured employees in § H(1). NIH Policy § K(3) (emphasis added); NIH Policy § H(1). One

provision's silence should not eviscerate other provisions' explicit instructions.

This reading is confirmed by application of the general/specific canon of construction, *generalia specialibus non derogant*. "[I]t is a basic principle of statutory construction that a specific" provision "controls over a general provision . . . particularly when the two are interrelated and closely positioned[.]" *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981). Section L(1) is a general provision which applies to both tenured and non-tenured employees. Section K(3) is a specific provision which provides additional procedural protection only to tenured employees. Section H(1) similarly provides specific protection to tenured employees. There is no conflict between the provisions. There is an understandable silence in the general provision because there are explicit instructions in the specific provisions. The specific explicit tenure provisions should prevail over the general provision. This reading also comports with the express policy of NIH "that long, stable, productive careers will continue to be the rule" and that removal of tenure will only occur rarely. NIH Policy §§ K(1), K(3).

Although the negative-implication canon, *expressio unius est exclusio alterius*, which states that expression of one thing implies the exclusion of others, might apply to § L(1)'s failure to expressly provide for de-tenuring in a "for cause" removal in a vacuum, that canon should not apply here, where § K(3) expressly provides for de-tenuring in all cases and § H(1) provides for de-tenuring *whenever* the removal relates to the performance of ones duties as a tenured scientist. *See Orlando Food Corp. v. U.S.*, 423 F.3d 1318, 1325 (Fed. Cir. 2005) ("[T]he maxim *expressio unius est exclusio alterius* is not useful when its application would produce a result that is inconsistent with the plain language of the statute."); *see also U.S. v. Polanco*, 451 F.3d 308, 311 (3d Cir. 2006) ("*Inclusio unius est exclusio alterius* is a key canon in our interpretive arsenal, but we do not

deploy it when it produces a patently absurd result or when there is a direct statutory provision on point.").

Because § L(1) is silent as to whether de-tenuring must proceed a tenured scientist's termination "for cause," the panel majority reasons that "the NIH Policy's express inclusion of de-tenuring requirements for two other bases of removal," removal for unacceptable job performance under § H(1) and removal for administrative reasons under § L(1), reinforces its interpretation that de-tenuring is not required for any "for cause" termination, regardless of the claimed "cause." Maj. Op. at 1301. But that reasoning overextends the negative-implication canon to counteract § K(3)'s explicit statement that removal of tenure occurs only through the de-tenuring procedure and ignores the fact that a "performance-based action" under § H(1) may only occur after the de-tenuring process. The NIH need not have repeated itself in § L(1) to specify that de-tenuring must proceed a performance-based "for cause" removal. It had already made that abundantly clear in §§ K(3) and H(1).

The panel majority's reference to chapters 43 and 75 of title 5 of the United States Code also cannot overcome a plain reading of the NIH policy. None of the sections cited by the panel majority reference tenure or provide for a de-tenuring procedure. Even if the NIH drafted its own policy with an understanding of those provisions, it is clear the NIH adopted tenure protections that exceed those in the statutes. Those tenure protections should not go by the wayside where following them would be inconvenient or cumbersome for NIH.

I express no opinion on the policy implications of tenure protections, or the lack thereof, for NIH professionals. I agree with NIH that challenges to the wisdom of its tenure policy are beyond this court's purview. It is for NIH to decide its own tenure policy, within the bounds of the law. It has done so. It should be held to that policy. The majority's

conclusion that NIH may choose to ignore its tenure poli-
cies even when they clearly apply—as the majority con-
cedes they do here—renders NIH's tenure provisions a
nullity in most instances.[1]

I also pass no judgment on the severity of Dr. Braun's
conduct. It is not for us to determine whether Dr. Braun
should have been terminated, and, thus, de-tenured. This
court is only called on to determine if NIH's policies require
a de-tenuring process before removal of Dr. Braun's tenure,
regardless of the reasons. They do.

## CONCLUSION

I dissent from the denial of en banc in this matter. We
have not been called on to weigh the severity of Dr. Braun's
conduct and pass judgment on him, or to invent an easy
way for NIH to do so. Rather, this case presents a much
simpler issue—whether NIH must be held to its own un-
ambiguous procedures. I believe it must.

---

[1]    The majority seems to understand that its holding
would eviscerate the protections in §§ K(3) and H(1). *See*
Maj. Op. at 1303. It attempts to ameliorate this fact by
saying that its holding that § L(1) encompasses the same
activities covered by § H(1) only applies to non-routine per-
formance failures. *Id.* But the majority cites nothing in
the language of the policy that justifies that distinction.